*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SAFAA KOUSIBATI,

      Plaintiff-Appellee,

v

AYMAN ASAYED,

      Defendant-Appellant,

and

FRANK R. SIMON,

      Appellee.

UNPUBLISHED
August 08, 2025
11:30 AM

No. 367268
Oakland Circuit Court
LC No. 2019-876529-DO

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

Defendant-appellant, Ayman Asayed ("husband"), appeals by leave granted[1] the May 19, 2023 judgment of divorce from plaintiff-appellee, Safaa Kousibati ("wife") following a bench trial. For the reasons stated in this opinion, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This is a highly contentious divorce case—the trial court described "[t]he level of acrimony between these parties" as "extremely intense and all consuming." The parties met in November 2011 and husband proposed marriage soon after. The parties adhere to the Islamic faith and

---

[1] *Kousibati v Asayed*, unpublished order of the Court of Appeals, entered October 12, 2023 (Docket No. 367268). Husband missed the deadline for filing an appeal of right, but this Court granted his application for leave to file a delayed appeal. *Id*.

-1-

followed Islamic laws regarding marriage. Wife alleged the parties were religiously married before an imam at a Lansing-area mosque on November 7, 2012 and began living together afterward. Husband denied a religious ceremony ever took place, but testified the parties began living together in 2012 before they were married. The parties were legally married on January 22, 2015. Because the trial court found no evidence to prove that the parties were religiously married in 2012, it considered the parties' date of marriage as January 22, 2015. The parties had no children together, but wife's daughter from her first marriage lived with the parties.

During the relationship, the parties acquired real and personal property including the "Knightsbridge home," where wife lived during the divorce proceedings, and the "Maple Lakes home," where husband lived during the divorce proceedings.[2] The parties purchased the Maple Lakes home together in June 2013 and began living there in December 2013. Although wife's name was not on the deed, she believed the parties were married when the Maple Lakes home was purchased. While the parties were living together at the Maple Lakes home, husband wanted to purchase another home for "business purposes," and the parties decided together to purchase the Knightsbridge home in January 2015. Husband argued the Knightsbridge home was purchased before the date of the parties' legal marriage and was intended for his former wife Dalya Mohamad (Dalya). Testimony revealed the closing date for the Knightsbridge home was delayed until after the parties were legally married because the seller was in hospice care. Wife's name was not on this deed either.

Wife testified a domestic-violence incident occurred in August 2016 wherein husband slapped wife's face. She called 911 and reported the incident. Husband was arrested for domestic violence, pled guilty to a reduced charge of disturbing the peace, and was sentenced to 45 days in jail. Wife and her daughter moved into the Knightsbridge home in September 2016, but husband did not move there at that time because there was a no-contact order in place from the domestic-violence incident. Husband moved into the Knightsbridge home later in February 2017, after he was released from jail, and the parties lived at the Knightsbridge home together. Husband testified he kept and used the Maple Lakes property for his business.

Wife testified about another domestic violence incident that occurred on July 29, 2019 wherein husband attacked her during an argument and she called 911. Husband testified wife spit at and lashed out at him. Police officers responded, and wife and her daughter reported the incident. Husband was arrested for domestic violence, and wife obtained a PPO against him. Husband began living alone at the Maple Lakes home after this. Husband alleged wife also punched him and physically attacked him at various times throughout the relationship, but none of these incidents were reported and husband did not seek medical attention for them.

Several vehicles were purchased during the relationship, including a Chevrolet Malibu purchased in 2013, a BMW 7 Series purchased in 2015, a BMW motorcycle purchased in 2017, a Toyota Camry obtained in 2017, and a Porsche Cayenne purchased in 2018. Husband was the

---

[2] The trial court referred to the properties as such, and the names were based on the streets on which the homes were located.

registered owner of all vehicles except the Toyota Camry, which named wife on the certificate of title. All of the vehicles were used during the relationship. Wife drove all of husband's vehicles except the BMW 7 Series. Husband did not drive the Toyota Camry.[3] In addition, husband owned and operated Iceberg, LLC, an online business that sold medical textbooks, compact discs (CDs), printers, and printer ink on Amazon and eBay. Husband testified he owned 98% of the business, and each of his two children from a previous marriage owned 1% of the business. However, husband testified during trial that he had severe physical pain, depression, and post-traumatic stress disorder (PTSD) which prevented him from working or obtaining future work.

During the relationship, the parties also acquired gold bars and gold coins allegedly worth several hundreds of thousands of dollars. Wife alleged that husband purchased the gold for the parties' retirement savings and to buy a house. The parties disputed how much gold existed and who possessed it, and each accused the other of hiding the gold. The parties also had debts. Wife's debts included a $4,800 civil judgment that she owed to the law firm that represented her in a case in which she sought modification of child support for her daughter—husband promised to pay these attorney fees. Husband debts included $810,000 in credit-card debt he incurred for his business, and $40,000 in attorney fees to his former attorney.

Wife commenced the divorce action on September 17, 2019. The central dispute in the divorce action concerned the division of property, including the gold. On September 24, 2019, husband tried to convince wife to reconcile with him and told her she would not get anything if she proceeded with the divorce. Wife recorded this conversation on her cell phone and testified that in the recording, husband admitted to having the gold. The parties also had an unplanned encounter at the West Bloomfield Post Office in December 2019, where wife alleged husband admitted to having the gold. Wife also recorded this conversation. Wife's counsel sought to introduce the recordings as evidence, but husband's counsel objected, arguing the recordings were manipulated and were in the Arabic language, requiring authentication and translation. The recordings were translated from Arabic to English and transcribed by a translator. Later at trial, an audio and video forensic expert retained by wife determined the recordings were authentic. The forensic expert's fees were $5,000, and wife had paid $2,500.

Husband disputed the accuracy of the translations of the recorded conversations, alleging he spoke the Egyptian dialect of Arabic, wife spoke the Syrian dialect of Arabic, and this dialectical difference mattered because husband's words were wrongly translated as if he were speaking the Syrian dialect. Husband alleged this changed the meaning of his words. However, the translator testified she knew both the Egyptian and Syrian dialects and when she translated the conversations, she "used modern standard Arabic because that's the professional language of the courts and of the legal system as an interpreter." The translations of the recordings were admitted into evidence.

---

[3] Later during trial, the court ordered the sale of the Porsche Cayenne and the Toyota Camry and that the proceeds from the sale be held in escrow because of accruing fees owed by the parties, including fees owed to the parties' respective attorneys and a court-appointed receiver. The receiver sold the Porsche Cayenne for $61,500.

A receiver was also appointed by the trial court to manage the marital estate because of the trial court's concern over dissipation of the gold and other assets. The receiver went to each party's residence to conduct an inspection. When the receiver went to the Knightsbridge home, wife did not answer the door. The receiver required a locksmith to enter, and wife called the police. When the receiver entered and explained who he was and showed wife the receivership order, wife became less confrontational and more cooperative. The receiver testified an additional fee of $515 was incurred because of the need to call a locksmith. Husband willingly allowed the receiver into the Maple Lakes home, where a similar inspection was conducted. The receiver testified his total fees and expenses through July 2020 came to $5,000 and suggested wife should pay 75% and husband should pay 25% because more time was spent in wife's home, and because husband communicated with the receiver's office within days of the receiver's appointment whereas wife did not do so.

A trial was held over 18 days during the COVID-19 pandemic from August 2020 to January 2022. On January 14, 2021, the trial court entered an order adjourning trial indefinitely at the joint request of the parties due to COVID-19 concerns expressed by both parties' attorneys in joint informal communications with the trial court. The court expressed the need for an in-person trial rather than a Zoom trial because the assessment of witness credibility was critical to the court's decision in this case.

On April 22, 2021, while trial was adjourned, husband entered the Knightsbridge home with his sister, Ola Asayed (Ola), and changed the locks. Wife called the police, but Ola refused to leave. On April 23, 2021, wife filed an ex parte motion for an order to show cause why husband should not be held in contempt of court and for Ola's removal from the Knightsbridge home. On April 23, 2021, the trial court entered an order directing the receiver to take immediate control of the Knightsbridge home, requiring Ola to vacate the property, and providing that wife may take possession of the home. Husband was also directed to show cause why he should not be held in contempt. The receiver estimated his fees and expenses related to restoring wife's possession of the home came to $1,500 to $2,000, which the receiver opined husband should pay.

The contempt hearing was held over multiple dates in May 2021 and June 2021. The trial court found husband and Ola "manipulated a scheme in concert to oust [wife] from the [Knightsbridge home] and deny her access to the real and personal property [at the home], contrary to [the trial court's] numerous orders on this topic." The trial court found husband guilty of civil contempt, and ordered him to pay wife's reasonable attorney fees, and the receiver's fees, related to the contempt matter. The trial court also found husband guilty of two counts of criminal contempt, and imposed a jail sentence of 93 days for the second count.

The trial resumed during husband's incarceration, and ended in January 2022. Following trial, the trial court found that neither party was credible. The court could not conclude which party, if any, had possession of the gold. The court stated that although the translator was credible as a witness, it was unable to discern from the translated Arabic conversations what happened to the gold.

In a thorough 52-page opinion and order, the trial court recalled that it "repeatedly asked, warned, pleaded with, and chastised [husband] in order to control the flow and presentation of evidence during trial . . . ." The court stated it found neither party credible and noted that "the most substantial evidence in this case came from the parties' testimony." Ultimately, the trial court

was "left in a position to fashion an equitable ruling to the dissolution of this marriage from what it believes is available."

The court ordered that most of the parties' assets be liquidated, that attorney and receiver fees be paid from the liquidated estate, and that any amount left would be split between the parties, with 55% going to wife and 45% going to husband. The court deemed each party to have received his or her respective share of the gold, although the matter would be revisited if evidence emerged that one of the parties had been hiding the gold. Each party was responsible for his or her attorney fees, except that husband was solely responsible for attorney fees related to the contempt proceeding. The court ordered that $35,000 be escrowed from each party's share of the liquidated estate for the payment of their respective attorney fees. An additional $25,000 was to be escrowed from husband's share of the estate for the payment of attorney fees for the contempt proceeding. Husband was responsible for 75% of the receiver fees, and wife was responsible for 25%. This appeal ensued.

On appeal, husband presents arguments challenging the trial court's factual findings, the division of property, the appointment of the receiver, the division of responsibility for receiver fees, and the award of attorney fees.[4]

## II. CHALLENGES TO THE TRIAL COURTS FACTUAL FINDINGS AND DISPOSITIONAL RULINGS

## A. WE HOLD THERE WAS NO ERROR IN THE TRIAL COURT'S FACTUAL FINDINGS

We will first address husband's arguments challenging the trial court's findings of fact. A trial court's factual findings regarding the division of marital property are reviewed for clear error. *Hodge v Parks*, 303 Mich App 552, 554; 844 NW2d 189 (2014). "Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made." *Id*. at 555 (quotation marks and citation omitted). "Special deference is afforded to a trial court's factual findings that are based on witness credibility." *Id*.

Husband argues that wife devised a plot to oust him from the Knightsbridge home in 2019 by seeking a PPO against him for domestic violence. He contends that her plan was to remove

---

[4] Regarding the division of property, wife argues in her appellee brief that husband had the gold and that the trial court clearly erred in resolving the dispute over the gold. Wife asks that we remand the case to the trial court to determine the value of the gold hidden by husband and to award wife 55% of the value of the gold from other marital property. However, while we appreciate that wife has appeared *in propria persona*, wife has not filed a cross-appeal. Therefore, although she may urge alternative grounds for affirmance, she may not obtain greater relief or a decision more favorable than that rendered by the trial court. See *ABATE v PSC*, 192 Mich App 19, 24; 480 NW2d 585 (1991) ("It is true that an appellee that has not sought to cross appeal cannot obtain a decision more favorable than was rendered by the lower tribunal."). Wife's appellee brief asks for greater relief than was rendered by the trial court. Because wife has not filed a cross-appeal, and because she informed this Court at oral argument that there were ongoing proceedings with regard to the gold, we must deny her request.

him from the home so she could move the gold and that she sought extensions of the PPO as a ploy to continue hiding the gold. Husband says he was denied access to his business inventory, including the gold as well as a diamond bracelet. Husband disputes wife's testimony that she transferred the gold to him on August 10, 2019. Husband's argument is premised on his own testimony and concerns disputes of fact. He fails to identify any error of the trial court. Wife testified that the gold was the parties' savings rather than husband's business inventory. The trial court did not believe husband's testimony that the gold was part of his business inventory. The court stated, "[t]his position is not only incredible as a premise, but also, [husband]'s demeanor while providing this testimony was clearly untruthful."

A central dispute at trial concerned which, if either, party had the gold, and how much gold existed. Each party claimed that the other party possessed and was hiding the gold. The trial court found that both parties lacked credibility given the conflicting testimony as to the amount of gold that existed and where it was hidden. Neither party convinced the court by a preponderance of evidence that the other party had the gold. The court thus deemed each party to have received his or her share of the gold, although the court left open the possibility of revisiting the issue if evidence emerges that one of the parties was hiding the gold. This Court defers to the trial court's credibility determinations. *Hodge*, 303 Mich App at 555. Husband provides no basis upon which to find that the trial court clearly erred in its decision.

Husband also revisits the recorded conversations in Arabic between the parties in which they discussed the missing gold and other items. Consistent with his arguments in the trial court, he claims that the translations were written in the Syrian dialect of Arabic rather than the Egyptian dialect of Arabic that he was speaking. His argument on this point is inadequate because it consists of merely summarizing his own testimony. The trial court found that husband lacked credibility, and that the translator was credible and the translations were accurate, and we defer to that credibility determination. *Hodge*, 303 Mich App at 555. In any event, the trial court found that the translations of the recordings were not dispositive of how much gold existed and where it was located, so the trial court did not rely on the translations to find that husband had the gold. Rather, as discussed, the court indicated that neither party had convinced the court that the other had the gold. Because the trial court did not rely on the recordings in rendering a decision about the gold, there is no clear error in the trial court's factual findings regarding the gold, the translations about the gold, or wife's intentions in obtaining a PPO.

## B. ANY DELAYS TO LOWER COURT PROCEEDINGS WERE ATTRIBUTABLE TO HUSBAND

Husband next argues that unnecessary delays in trial punished him and devalued his share of the estate, however, he fails to explain how any trial delays would entitle him to appellate relief. In any event, the trial court correctly explained that the delays were attributable to matters beyond the court's control, including COVID-19 restrictions as well as husband's own conduct. The trial court preferred an in-court trial rather than a trial via Zoom videoconferencing during COVID-19 because the court understandably viewed the assessment of witness credibility as critical to the resolution of the case.

The trial began on August 28, 2020, when access to the courthouse was restricted because of pandemic guidelines. Early in the trial, husband requested a forensic analysis of the Arabic

recordings about the gold, which caused the trial to be adjourned. The forensic examination ultimately revealed that husband's challenge to the authenticity or integrity of the recordings was baseless. Later adjournments occurred at the request of both parties' attorneys because of the continuing pandemic. When trial was set to resume in May 2021, it was again delayed because of a contempt hearing held over multiple dates due to husband improperly intruding into the Knightsbridge home in violation of court orders. The trial court has also noted that the trial was slowed down considerably by husband's "disruptive and obtrusive," and "combative" behavior in the courtroom, particularly while testifying. Also, husband's behavior in the courtroom was so inappropriate that at one point, the court struck him as a witness, although the court later reconsidered that decision and reinstated him as a witness. Overall, husband's suggestion that he is entitled to appellate relief because of trial delays is devoid of merit because many delays were attributable to him.

## C. THERE WAS NO ERROR IN THE TRIAL COURT'S DIVISION OF PROPERTY

### 1. A TRIAL COURT NEED NOT RETURN DIVORCED PARTIES TO THE POSITIONS THEY HELD BEFORE THE MARRIAGE

In challenging the division of property, husband first contends that the parties should have been returned to the positions they held before getting married because their marriage was short and childless. He argues that such an outcome is supported by this Court's decisions in *Bone v Bone*, 148 Mich App 834; 385 NW2d 706 (1986), and *Stathas v Stathas*, 1 Mich App 510; 136 NW2d 713 (1965). Both of those opinions noted the short duration of the marriage and rejected the appellant's challenge to the equity of the trial court's property division. See *Bone*, 148 Mich App at 839; *Stathas*, 1 Mich App at 511-512. It was also noted in *Stathas*, 1 Mich App at 511, that no children were born of the marriage. But these cases do not create a categorical rule that where the marriage is short and where no children were born, the trial court must return the parties to a divorce to their original positions.

This Court has rejected similar arguments before—in *Nielsen v Nielsen*, 179 Mich App 698, 700; 446 NW2d 356 (1989),[5] the defendant argued that, because the marriage was short, "this Court should divide their property so as to place them at approximately the same positions which they occupied prior to their marriage." This Court noted that it did "not favor this approach to a property settlement." *Id*. This Court stated, "[w]e are unpersuaded by defendant's argument because it fails to take into account all of the factors which are relevant to the equitable division of the parties' property." *Id*. Consistent with *Nielsen*, we disagree with husband's legal contention

---

[5] Although we are required to follow cases decided on or after November 1, 1990, see MCR 7.215(J)(1), a published case decided by this Court "has precedential effect under the rule of stare decisis," MCR 7.215(C)(2). See also *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (stating that although this Court is not "strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990," those opinions are nonetheless "considered to be precedent and entitled to significantly greater deference than are unpublished cases") (emphasis omitted).

that the trial court erred when it failed to restore the parties to the positions they held before the marriage.

### 2. THERE WAS NO ERROR IN THE TRIAL COURT'S CONSIDERATION OF THE *CASSIDY* FACTORS

Husband next contends the trial court's ruling on the division of property was inequitable.

> If the trial court's findings of fact are upheld, this Court must decide whether the dispositive ruling was fair and equitable in light of those facts. The dispositional ruling is discretionary and will be affirmed unless this Court is left with a firm conviction that the division was inequitable. [*Butler v Simmons-Butler*, 308 Mich App 195, 208; 863 NW2d 677 (2014).]

"A trial court's first consideration when dividing property in divorce proceedings is the determination of marital and separate assets." *Woodington v Shokoohi*, 288 Mich App 352, 358; 792 NW2d 63 (2010) (quotation marks and citation omitted). "Generally, marital assets are subject to being divided between the parties, but separate assets may not be invaded." *Id*. Broadly speaking, "marital property is that which is acquired or earned during the marriage, whereas separate property is that which is obtained or earned before the marriage." *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). Marital property may include appreciation of a premarital asset, *Dart v Dart*, 460 Mich 573, 585 n 6; 597 NW2d 82 (1999), unless the appreciation was wholly passive, *McNamara v Horner*, 249 Mich App 177, 183-184; 642 NW2d 385 (2002). Also, "separate assets may lose their character as separate property and transform into marital property if they are commingled with marital assets and treated by the parties as marital property." *Cunningham*, 289 Mich App at 201 (quotation marks and citation omitted).

Indeed, the trial court itself noted that the case should and could have been "a relatively straightforward divorce action where no minor children are involved" but that the case had been complicated by the "extremely intense and all consuming" level of acrimony between the parties and their disagreement over everything, including when they were married. Also, there was extensive testimony regarding the parties' accumulation of assets during the marriage, and husband fails to establish any error in the court's analysis as to the determination of which property is marital property, and as to the division of marital property.

Once the trial court determines what is marital and what is separate property, "[e]quity serves as the goal for property division in divorce actions." *Cassidy v Cassidy*, 318 Mich App 463, 477; 899 NW2d 65 (2017). "Although marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults, and needs." *Id*. The following factors are considered in dividing marital property to the extent the factors are relevant to the circumstances of a case:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. There

may even be additional factors that are relevant to a particular case. . . . The determination of relevant factors will vary depending on the facts and circumstances of the case. [*Id*. (quotation marks and citation omitted).]

"The trial court must consider all relevant factors but not assign disproportionate weight to any one circumstance." *Id*. (quotation marks and citation omitted). "This Court defers to a trial court's findings of fact stemming from credibility determinations." *Id*.

Husband challenges the trial court's findings regarding certain factors relevant to the division of marital property. The trial court properly considered all relevant factors, including the duration of the marriage. *Id*. at 477. The trial court rejected wife's position that the marriage began at the time of a religious ceremony alleged by wife to have occurred in 2012, and the court expressed uncertainty whether such a religious ceremony even occurred. The court instead concluded that the marriage began when the parties were legally wed in January 2015 and that the marriage thus lasted eight years. And in considering other factors, including the life status of the parties and the necessities and circumstances of the parties, see *id*., the court recognized that the parties each had a child or children from a prior relationship, implicitly recognizing that they had no children together. The court was well aware of this fact from the 18-day trial.

Regarding the health of the parties, *Cassidy*, 318 Mich App at 477, husband asserts that the trial court failed to consider his poor mental health. Husband testified briefly about alleged mental-health issues. Again, however, the trial court found that husband was "totally and completely not credible in these proceedings" and afforded his testimony no weight. This Court defers to the trial court's credibility determination. *Hodge*, 303 Mich App at 555. Husband fails to identify any other evidence of his poor mental health. He has therefore failed to establish any clear error in the trial court's findings with respect to this factor.

Husband then challenges the trial court's findings regarding the necessities and circumstances of the parties, *Cassidy*, 318 Mich App at 477, highlighting that the trial court referred to wife's child from a prior relationship but did not mention that husband has two children from a prior relationship. Husband says that he has no legal obligation to care for wife's child. Husband further says that the trial court's finding on this factor reflected bias against him.[6] Husband's argument on this point lacks merit. The trial court did not state that husband had any legal obligation to support or care for wife's child. The court merely noted that wife had "a minor child in her care from a prior relationship." The court was well aware that husband has children from a prior relationship; the court noted this fact in its findings regarding the life status of the parties by stating that "[b]oth parties have children . . . ." Husband's children lived in Egypt, whereas wife's child lived with wife, which explains why the court stated, with respect to the

---

[6] Although husband makes brief (and baseless) allegations of judicial bias, he does not present a standalone argument that he is entitled to appellate relief on the basis of judicial bias, nor does he include any such issue in his statement of questions presented. Any such claim has thus been abandoned and waived. *Seifeddine v Jaber*, 327 Mich App 514, 519-521; 934 NW2d 64 (2019).

necessities and circumstances of the parties, that wife had "a minor child in her care from a prior relationship." The court did not clearly err in its findings.

With respect to the parties' past relations and conduct, *Cassidy*, 318 Mich App at 477, husband vaguely suggests that it was improper for the trial court to note that husband "has been adjudicated on multiple instances of domestic violence" and "was found in civil and criminal contempt for his intrusion into the Knightsbridge property." Husband fails to cite authority or present adequate argument explaining why it was improper for the trial court to refer to these matters in analyzing the parties' past relations and conduct. Husband cannot rely on this Court to make his arguments for him or to search for authority to support his position. See *Seifeddine v Jaber*, 327 Mich App 514, 519-521; 934 NW2d 64 (2019). And in fact, this Court has held that a trial court may consider domestic violence when weighing the parties' past relations and conduct. See *Loutts v Loutts*, 298 Mich App 21, 32; 826 NW2d 152 (2012) (holding the trial court did not clearly err when it stated the parties were equally at fault for the breakdown of the marriage where one of the parties was acquitted of a charge of domestic violence).

Husband also notes that the trial court acknowledged wife had a temper and could be manipulative, and suggests that these points should also have been made in the analysis of the parties' past relations and conduct. But in analyzing this factor, the court did not fail to recognize negative aspects of wife's conduct. The court noted husband's testimony about wife's alleged acts of domestic violence. The court stated that, although wife was not criminally charged for any acts of domestic violence, the court believed that wife was "not a wholly innocent party in the dramatic and sometimes physical dynamic between these two individuals," although the court believed that "the most concerning behavior comes from [husband]." The court described "[t]he parties' conduct" as "chaotic, disruptive, and even dangerous at times." The court did not clearly err in its findings on this factor, and considered that both parties contributed to the breakdown of the marriage.

Finally, husband argues that the trial court clearly erred in failing to divide certain debts. The trial court stated that, except as the court indicated otherwise, any debt was "the sole responsibility of the party whose name is associated with that debt." This applied to both parties, and wife was held responsible for the civil judgment in her name despite husband's promise to pay it. The trial court awarded husband's business, Iceberg, LLC, to him "as his sole and separate property, including any actual business debt associated with that entity." Husband fails to establish any clear error. He summarizes his various business debts as well as his debts to three individuals: his sister, Ola; his former wife, Dalya; and his former attorney, Channelle Kizy-White. Husband fails to provide an adequate argument explaining how these debts qualify as marital debts that should be subject to division between the parties. To the extent husband is relying on his own testimony, his argument fails because the trial court found that he was "totally and completely not credible in these proceedings" and afforded his testimony no weight. We again defer to the trial court's credibility determination. *Hodge*, 303 Mich App at 555.

We hold the trial court's division of property was equitable in light of the facts and circumstances.

## 3. THE TRIAL COURT'S ORDER FOR THE RECEIVER TO LIQUIDATE THE PARTIES' ASSETS WAS PROPER

Husband next challenges the trial court's decision to require the receiver to sell and liquidate the two residential properties as well as the contents of the homes. Husband asserts that both homes were purchased before the parties' marriage. He further says that the record is devoid of evidence that wife purchased furnishings, artwork, or appliances for the homes. Husband thus argues that liquidating these items served to punish him while unjustly enriching wife. Husband's contention lacks merit. The trial court soundly rejected husband's argument that the Maple Lakes property was his separate property. The court found that, although husband may have used separate funds for the initial purchase of the Maple Lakes property in 2013, the parties commingled "the asset throughout their courtship and eventual marriage." They lived together in the Maple Lakes home before their date of legal marriage and husband provided for wife in that home. The court further rejected husband's "contention that the Knightsbridge property's procurement *would* have closed prior to the parties' [marriage] but for the allegation a necessary party to the closing was [in hospice] . . . ." As the trial court noted, "[t]estimony clearly demonstrated the Knightsbridge property was a contemplated marital asset and acquired by the parties after their marriage." The parties together decided to purchase the Knightsbridge home. They also lived together in the Knightsbridge home after the date of their legal marriage. The relevant contents of the homes were also reasonably viewed as marital assets, except for the parties' personal effects, clothing, and other items that were excluded from the liquidation directive. The court properly determined that liquidation was necessary on various grounds, including, as relevant here, the failure of the parties to provide present-day valuations for the properties.

Husband further argues that the trial court punished him and unjustly enriched wife by ordering the receiver to sell the parties' vehicles. He says that the value of the vehicles should have been considered. He accuses the trial court of "completely ignor[ing] the testimony, or lack thereof, regarding the vehicles." Husband fails to explain what he means by "the testimony, or lack thereof," that the trial court supposedly ignored and we decline to make his argument for him. *Seifeddine*, 327 Mich App at 521. Husband fails to establish any error in the court's decision "to sell the parties' vehicles and split the proceeds equally after payment of debts subject to the directives in this opinion and order."

Finally, husband argues that the trial court lacked authority to include in the marital estate the two parcels of real property that were not titled in either party's name. Husband quitclaimed the Knightsbridge and Maple Lake properties to Ola for $1 each on September 6, 2019, a mere 11 days before wife filed her divorce complaint. As discussed, the trial court found that both properties were marital assets because the parties lived in each of them during the marriage. The trial court discredited husband's testimony that he transferred ownership of the parcels to Ola in order to settle his debts to her. The court stated that husband's "transfer of both real property parcels was a haphazard attempt to keep marital assets from being within the Court's reach in these proceedings." The trial court further noted that husband "also likely lacked an understanding that even *if* assets in a divorce are deemed wholly separate property, the Court still may invade those assets in order to make the divorcing parties whole in light of the circumstances of their marriage." See *Allard v Allard (On Remand)*, 318 Mich App 583, 601; 899 NW2d 420 (2017) (noting that, when dividing property in a divorce case, the trial court has "equitable discretion to invade separate assets if doing so is necessary to achieve equity"); see also *Cassidy*, 318 Mich App at 493 ("The

-11-

trial court—as a matter of equity and without a jury—may determine whether a third party has acted in concert with a spouse to deprive the other spouse of his or her share of the marital estate. If the answer is 'yes,' then the trial court may fashion a remedy to ensure an equitable division of marital assets."). The trial court stated that husband's "contention these properties are 'owned' by his sister (and in some way held in a fictional trust for his children and prior spouse) are without merit, not supported by the evidence, and are without legal authority." The court ordered the receiver "to take any and all necessary steps to effectuate title to dispose of the properties as provided in this opinion."

Husband has not established any error in the court's dispositional ruling, and we affirm the trial court's order regarding the division of property.

## III. APPOINTMENT OF A RECEIVER WAS NECESSARY AND THE DIVISION OF THE RECEIVER FEE WAS REASONABLE

Next, husband argues that the trial court abused its discretion by appointing the receiver and by requiring husband to pay a greater share of the receiver fees. We disagree.

This Court reviews for an abuse of discretion a trial court's decisions regarding the appointment of a receiver, *Shouneyia v Shouneyia*, 291 Mich App 318, 325; 807 NW2d 48 (2011), and an award of fees to a receiver, *Band v Livonia Assoc*, 176 Mich App 95, 111; 439 NW2d 285 (1989). "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 273; 761 NW2d 761 (2008).

"A circuit court has broad jurisdiction to appoint a receiver in an appropriate case." *Reed v Reed*, 265 Mich App 131, 161; 693 NW2d 825 (2005). MCL 600.2926 provides, in relevant part, that "[c]ircuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law." This Court has explained:

> MCL 600.2926 has been interpreted as authorizing a circuit court to appoint a receiver when specifically allowed by statute and also when no specific statute applies but the facts and circumstances render the appointment of a receiver an appropriate exercise of the circuit court's equitable jurisdiction. The purpose of appointing a receiver is to preserve property and to dispose of it under the order of the court. In general, a receiver should only be appointed in extreme cases. [*Shouneyia*, 291 Mich App at 326 (cleaned up).]

Husband argues that this was not an extreme case and that there was no justification for appointing a receiver. But the trial court reasonably determined that the appointment of a receiver was necessary to preserve the marital estate. In its opinion and order issued after the divorce trial, the trial court explained that, because its continuing concern "over inappropriate dissipation of assets was ongoing in this matter, on March 11, 2020, the Court appointed a Receiver to manage the marital estate." The most valuable asset in dispute consisted of gold worth several hundreds of thousands of dollars, with each party claiminh that the other was hiding the asset. There was also a dispute over the parcels of real property, which husband had transferred to Ola. Husband asserts that there was no risk of dissipation of assets because he lacked access to the Knightsbridge

home. But husband and Ola at one point invaded the Knightsbridge home and displaced wife's residency there, in contravention of court orders, which is what led to husband being held in contempt. The receiver played a key role in restoring wife's residency. The trial court did not abuse its discretion in determining that the appointment of a receiver was necessary.

Further, the trial court did not abuse its discretion in assigning payment of the receiver's fee to the parties. "Receivers have a right to compensation for their services and expenses." *Ypsilanti Charter Twp*, 281 Mich App at 280 (quotation marks and citation omitted). The trial court has discretion in awarding compensation to the receiver. *Band*, 176 Mich App at 111. Husband challenges the trial court's division of responsibility for receiver fees. The court ordered that 25% of receiver fees be paid from wife's portion of the liquidated marital estate and that 75% be paid from husband's portion. The court stated that this division was appropriate because husband's conduct created the initial need for the receiver and substantially increased the receiver's costs, including because of the contempt proceeding and issues related to the sale of one of the vehicles.

The court noted, however, that husband was more cooperative than wife with respect to the receiver's initial inspections of the homes—wife initially did not allow the receiver to enter the Knightsbridge house and the receiver required a locksmith to enter, but when the receiver explained to wife that he was there to conduct an inspection under a receivership order, wife became more cooperative and allowed the receiver to inspect the property. The court thus found that "the 25/75 breakdown [was] a fair and equitable amount of accountability given the totality of the circumstances of this case as it relates to Receiver fees payment." In a cursory argument, husband emphasizes that wife increased receiver costs related to the initial inspection because of the necessity of a locksmith. But the trial court expressly considered this point. The trial court reasonably found that husband's conduct more substantially increased the receiver's costs, including with respect to the contempt proceeding and the sale of a vehicle. The court did not abuse its discretion in determining that a "25/75 breakdown" was a fair and equitable division.

## IV. ATTORNEY FEES

Finally, husband challenges the trial court's decision regarding attorney fees. A trial court's decision whether to award attorney fees is reviewed for an abuse of discretion. *Reed*, 265 Mich App at 164. Any underlying findings of fact are reviewed for clear error, and any questions of law are reviewed de novo. *Id*.

Husband's argument regarding attorney fees is difficult to follow. It appears he is contesting the court's decision that he was solely responsible for attorney fees related to the contempt proceeding and that the receiver was to escrow $25,000 from husband's share of the liquidated estate for attorney fees related to that proceeding. Husband's argument is unconvincing.

"[A]ttorney fees are not recoverable as of right in divorce actions." *Reed*, 265 Mich App at 164. Attorney fees are authorized by statute, MCL 552.13, and court rule, MCR 3.206(D). *Reed*, 265 Mich App at 164. MCR 3.206(D) provides:

-13-

**(D) Attorney Fees and Expenses.**

(1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

(2) A party who requests attorney fees and expenses must allege facts sufficient to show that:

(a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay, or

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

"Attorney fees in a divorce action are awarded only as necessary to enable a party to prosecute or defend a suit but are also authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of litigation." *Richards v Richards*, 310 Mich App 683, 700; 874 NW2d 704 (2015) (quotation marks and citation omitted).

Here, the trial court noted that both parties sought an award of attorney fees. Although husband's behavior led the court to consider awarding wife attorney fees, the court was not convinced that wife had "demonstrated entitlement to fees outright." The estate was being liquidated so that each party would receive "a cash-out on any remaining assets." Also, the court was ordering the receiver to pay an amount to both parties' attorneys because the court was "not satisfied *either* party will pay their attorney following these proceedings based on what was presented during trial." Other than the contempt proceeding, wife did not show that husband "was otherwise in *violation* of court orders sufficient to sustain an attorney fee request." Although husband "certainly increased the length of time it took to conduct trial, [d]efendant is entitled to present his 'side of the story.' " Likewise, husband had provided no basis for an award of attorney fees in his favor.

The court stated that, upon liquidation of the estate, the receiver was "to pay both counsel $35,000 from the assets of the marital estate." Any additional amount owed for attorney fees was "the sole responsibility of the individual party and subject to any respective fee agreements." The court added, "[T]he remaining fees either party may owe can be addressed through their share of the marital estate post-liquidation, should any attorney need to file an appropriate attorney lien or take any other appropriate action."

The court ruled that husband bore sole responsibility for reasonable attorney fees for the contempt proceeding. The court ordered the receiver to escrow $25,000 from husband's "share of the estate for resolution of this issue." Wife's counsel was given 60 days after the entry of the judgment of divorce to file a fee petition with a bill of particulars regarding the contempt proceeding, and the court would either order briefing or hold an evidentiary hearing.

Husband asserts that the requirement that $25,000 of his share of the liquidated estate be escrowed for attorney fees for the contempt proceeding was "contrary to established Michigan jurisprudence." Husband fails to cite any authority for this assertion or to explain why this aspect of the court's ruling is contrary to established Michigan jurisprudence. He cannot rely on this Court to make his argument for him or to search for authority to support his position. *Seifeddine*, 327 Mich App at 519-521. The contempt proceeding arose from husband's misconduct in connection with this case, including his violation of court orders. The court thus had authority to require husband to pay attorney fees related to the contempt proceeding. MCR 3.206(D)(2)(b); *Richards*, 310 Mich App at 700.

Husband further suggests that the divorce proceedings were delayed through no fault of his own and that the delay harmed him financially. As explained earlier, the trial court found that the delay was caused by husband's own unreasonable conduct as well as by pandemic restrictions. Husband says that he would not have been held in contempt but for the trial judge's bias. This assertion is baseless. Husband was held in contempt because of his improper actions that violated court orders. The trial judge exhibited patience and fairness throughout the proceedings, including in the face of husband's problematic behavior in the courtroom. And to the extent fees increased because of delays brought about by a global pandemic or earlier described party misconduct, that financial burden is appropriately borne by the parties. Accordingly, husband's argument regarding attorney fees lacks merit.

Affirmed.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin